Georgia Mae DOWNS, Plaintiff,
Appellant,

v.

Roberta SAWTELLE et al.,
Defendants, Appellees.

No. 77–1260.

United States Court of Appeals,
First Circuit.

Argued Sept. 9, 1977.

Decided March 30, 1978.

Stephen D. Clapp, North Attleboro, Mass., with whom Armstrong, Pollis & Clapp, North Attleboro, Mass., Douglas A. Clapp, Michael J. Cunniff, and Stitham, Clapp & Cunniff, Pittsfield, Maine, were on brief for plaintiff, appellant.

* Of the Fifth Circuit, sitting by designation.

Stephen H. Shook, Milo, Maine, with whom Edgerly & Shook, Milo, Maine, was on brief, for Davis A. Goodine, defendant, appellee.

Joseph M. Kozak, Asst. Atty. Gen., Augusta, Maine, for Ruth A. Hagan, Marilyn B. Dow, and Mary Lou Pattison, defendants, appellees.

John L. Easton, Jr., Dover-Foxcroft, Maine, with whom C. W. & H. M. Hayes, Dover-Foxcroft, Maine, was on brief, for Roberta Sawtelle, defendant, appellee.

Phillip D. Buckley, Bangor, Maine, for Carl H. Carlson, defendant, appellee.

Malcolm L. Lyons, Augusta, Maine, with whom Wathen & Wathen, Augusta, Maine, was on brief, for John B. Curtis, defendant, appellee.

John M. Wallach, Bangor, Maine, for Milo Community Hospital and Ava Strout, defendants, appellees.

Rudman, Winchell, Carter & Buckley, Bangor, Maine, on brief, for Carl H. Carlson, Milo Community Hospital and Ava Strout, defendants, appellees.

Before COFFIN, Chief Judge, TUTTLE, Circuit Judge,* WOLLENBERG, District Judge.**

COFFIN, Chief Judge.

Georgia Mae Downs, a deaf mute mother of two children born out of wedlock, brought this action for damages under 42 U.S.C. § 1983, alleging a conspiracy to sterilize her against her will, to delay her marriage to her present husband, and to remove her second child from her custody, all in violation of her constitutional rights. Before trial, summary judgment was granted to defendants Milo Community Hospital, where the operation was performed, its administrator, Ava Strout, and the town manager of Milo, Maine, Mr. Carlson, who authorized payment for the sterilization out of municipal funds. At the close of the plaintiff's evidence before a district court jury, verdicts were directed for defendants, Ro-

**4**

berta Sawtelle, plaintiff's sister and spendthrift guardian[1]; Dr. John Curtis, the Chief of Staff of Milo Community Hospital and attending surgeon at the operation; three social workers of the state of Maine Department of Health and Welfare, who approved and helped arrange the guardianship proceedings, custody surrender, and sterilization; and Davis Goodine, the plaintiff's father. Plaintiff now appeals.[2]

This was an exceptionally confusing and emotional case. The district court was required to deal with a large quantity of conflicting evidence and extraordinary problems of communication. Our discussion will not fairly reflect these problems, for, in accordance with the standards for appellate review of orders disposing of a case by summary judgment and directed verdict, we present the evidence in the light most favorable to the plaintiff. *See Adickes v. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Wilson v. Nooter Corp.*, 475 F.2d 497, 501 (1st Cir. 1973).

Although she was apparently born with normal hearing, plaintiff became deaf at age three, when hot coffee scalded her ear. Her primary and secondary school years were spent at the Governor Baxter State School for the Deaf. Although plaintiff was instructed in American Sign Language and taught to read and write, communication with her was frequently quite difficult. Tests showed her to have the reading comprehension of a fourth grader and borderline or dull normal intelligence.

Following her graduation from the Baxter School at age 18, plaintiff returned to her home town of Milo, Maine. Her social behavior provoked considerable conflict among the members of her family. At age 19, plaintiff gave birth to her first out-of-wedlock child. She cared for it for a time, but later surrendered it to her father, who

obtained legal custody of the child and boarded it with his girl friend. Marilyn Dow, a state social worker assigned to plaintiff's case, and Dr. Curtis, the family physician, attempted to introduce plaintiff to various methods of contraception, but fifteen months after the birth of her first son, plaintiff was again pregnant.

The prospect of a second child gave rise to two concerns: placement of the baby and prevention of future pregnancies. Plaintiff's father petitioned the state probate court to be appointed her guardian in order to place the second child with its half-brother. Roberta Sawtelle opposed her father's petition and, with the backing of Mrs. Dow, herself sought appointment as plaintiff's spendthrift guardian, with a view to surrendering the child for adoption. At some point Sawtelle learned that plaintiff planned to marry Carroll Downs and wanted to have children with him. Although Downs was not the father of the child plaintiff was carrying, he intended to keep it after his marriage to plaintiff and wanted it to bear his name. Dow and Sawtelle, however, were aware that the existence of a husband could impede efforts to have the child adopted, and they agreed that Sawtelle would persuade plaintiff and Downs that her consent to the marriage was required and would withhold it until after the baby's birth.

There is conflicting evidence as to the origin of the idea to have plaintiff sterilized. Social worker Mary Lou Pattison asserted that the father contacted the Department of Health and Welfare for help in coping with plaintiff's second pregnancy and for state funds to pay for the sterilization. However, the father's deposition and the agency's own reports indicate that the agency initiated the idea. Sawtelle, who had herself been sterilized, seems to have favored it from the beginning. In any

---

1. Under 18 M.R.S.A. § 3601(2) a spendthrift guardian may be appointed for adults who "so spend or waste their estate as to expose themselves or families to want or suffering or their towns to expense."

2. We affirm the judgment of the district court as to defendants Strout, Goodine and Carlson.

Our review of the record makes it plain that their conduct, which amounted to no more than mere negligence, is not actionable under section 1983. *See Paul v. Davis*, 424 U.S. 693, 700–701, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).

event, it was Dow who assumed responsibility for contacting Dr. Curtis about medical preparations for the operation and arranged to have the town of Milo assume the necessary medical expenses.

As plaintiff's pregnancy progressed, sterilization was repeatedly proposed to her by Dr. Curtis and her sister, who accompanied her on each prenatal visit. Attempts to explain the meaning of sterilization through handwritten notes from the doctor and sign language interpretation by Sawtelle met with considerable difficulty. Dr. Curtis and Sawtelle asserted that plaintiff ultimately understood that sterilization meant she would have "no more babies" and that she agreed with the proposal. Plaintiff insisted that, to the extent of her limited ability to communicate, she registered her opposition but Sawtelle and the doctor continued to discuss plans for the sterilization. Some time before the operation was to be performed, plaintiff wrote a letter to Dr. Curtis which, although difficult to decipher, expressed her plan to marry Carroll Downs and her wish to have additional children with him.[3] Dr. Curtis testified at trial that he treated the letter "so lightly that I didn't attach too much importance to it." He continued to make the necessary arrangements for the operation.

There was considerable testimony, much of it confusing and contradictory, as to the authority under which the operation was actually performed and the understanding of the participants in that regard. The policy of Milo Community Hospital, of which Dr. Curtis was Chief of Staff, permitted sterilizations in any of six circumstances. It was conceded that only one of them, mental retardation, could even arguably apply to the plaintiff. Dr. Curtis testified, however, that he did not consider plaintiff to be feeble-minded or retarded and that he had not read any test results indicating she was either. Yet Dr. Curtis' hospital report recommended sterilization

"based 90% on this girl's low mentality involving poor judgment and her lack of restraint on sex appetite and its consequences."

Dr. Curtis requested that two other physicians consult with him on the case. Their written reports were devoid of any medical analysis or any indication that plaintiff consented to the operation. One physician concluded, without elaborating, that plaintiff "apparently lack[ed] ability to curtail normal appetite for sex", that she was "[p]otentially dangerous", and that her low economic earning power demonstrated "irresponsibility". The second physician's report stated, "uncontrolled appetite leads to promiscuity. Apparently retarded. Incapable of functioning in a maternal role."

Hospital policy also required that the patient and another party (the form suggests a spouse) sign a standardized sterilization consent form. Although plaintiff signed other minor forms on her entry into and discharge from the hospital, she was never approached to sign the sterilization consent form. Indeed none of the defendants attempted to explain the form to her, although Dr. Curtis conceded that it could have been explained in terms she could have understood. Instead of plaintiff, her spendthrift guardian, Sawtelle, signed the form.

Dr. Curtis testified that he relied on the guardian's consent to perform the operation, although he had never before done so. Some time prior to the operation he asked social worker Marilyn Dow who could legally consent to the operation. Although Dow suggested that he obtain that information from the probate judge, the doctor ignored the advice and made no other effort to determine the legal prerequisites for an operation of this nature. He relied on his memories from medical school and his internship, which concluded in 1937, that a guardian's consent sufficed.

According to Dr. Curtis, plaintiff at all times indicated her consent to be sterilized.

---

**3.** The letter read: "My Boyfriend Carrol Downs said he want my baby two family agains. I will get married on March 3 over Carroll want me to new baby agains ok. I want Baby agains to 2 my family."

There is considerable dispute as to her agreement as the time for the operation approached. Plaintiff testified that the night before she was to be sterilized she informed Dr. Curtis she did not want the operation. That same evening her fiance communicated to Sawtelle and the doctor both plaintiff's opposition and his own.[4] A newspaper reporter who later covered the story testified that he discussed the operation with Dr. Curtis, who said he "went up later to talk with Georgia and, although she was opposed at first, . . . she eventually agreed to the sterilization." According to the reporter, the doctor observed, "She follows what the last person says to her."

On March 20, 1973, plaintiff gave birth to a baby boy, Robert Scott Goodine. Four days later she was sterilized by means of a fallotomy. From that day forward she has been permanently incapable of bearing children. Plaintiff was not permitted to see her child after its birth, despite her requests to do so. The child was removed from the hospital by Mary Pattison and placed in a foster home.

The authorization for taking the child is also in dispute. Before the birth of the child, the Maine Attorney General had advised the state social workers that plaintiff's guardian could not legally consent to the adoption of plaintiff's child. The day the child was taken from the hospital, Roberta Sawtelle signed an Agreement of Responsibility for Temporary Care of the baby. Six days later a petition for temporary termination of custody was filed with the probate court. A hearing was set for April 19, but no interim custody order was entered. At the April 19 hearing the probate court ordered that plaintiff's child be placed in the temporary custody of the state of Maine.

From the birth of the child until April 19, the only authority the state's social welfare employees had for keeping the child from its mother was the Agreement of Responsibility for Temporary Care signed by plaintiff's guardian. One of the social workers, Miss Hagen, testified that the use of such an Agreement was not unusual.

At the present time plaintiff is married to Carroll Downs. The spendthrift guardianship has been dissolved and the custody of Robert Scott Goodine has been restored to her.

## I. STATE ACTION

■ The threshold question for our analysis is whether Milo Community Hospital can be considered a "state actor" for the purposes of § 1983 liability.[5] The district court did not rule on this issue although it intimated that the weight of authority is to the contrary. The issue is far from simple. For the past sixteen years courts have struggled to follow the admonition of the Supreme Court in *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) that "[o]nly by sifting facts and weighing circumstances" can the legal significance of state involvement in private conduct be determined. On balance we conclude from the record at this stage of the proceedings that the "State has so insinuated itself into a position of interdependence with [Milo Community Hospital] that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as

---

4. According to Downs' deposition, Dr. Curtis replied, "You cannot stop me on the operation."

5. The Second Circuit has adopted a flexible approach to state action analysis, providing for less rigorous scrutiny in racial discrimination cases. See *Weise v. Syracuse University*, 522 F.2d 397, 406 (1975) ("A consideration of whether there is state action necessarily entails a balancing process. . . . As the conduct complained of becomes more offensive, and as the nature of the dispute becomes more amena-

ble to resolution by a court, the more appropriate it is to subject the issue to judicial scrutiny.") We have expressed our reservations to this approach, in *Lamb v. Rantoul*, 561 F.2d 409, 411 (1st Cir. 1977). Even were we to adopt such an approach, however, we would be inclined to group infringements of fundamental rights and racial discrimination together for the purpose of state action analysis just as they receive comparable scrutiny in equal protection cases.

to fall without the scope of the Fourteenth Amendment." *Id.* at 725, 81 S.Ct. at 862.

The involvement of the state in the operation of Milo Community Hospital is multi-faceted. Thirty percent or more of its operating budget resulted from Medicare funds. The hospital was subject to significant governmental regulation. The entire board of directors subsequent to the original incorporators was appointed by the Board of Selectmen of the town of Milo. Any profits earned by the hospital are to be distributed to the town of Milo. If the hospital should be dissolved, all assets after payment of debts revert to the town of Milo.

Appellees present an imposing array of cases holding that partial governmental funding of a hospital and the fact that it is subject to general state regulation does not transform a private hospital into a state actor.[6] We have carefully examined these decisions. However, even the case with the strongest indicia of state action of all those cited, *Greco v. Orange Memorial Hospital Corp.*, 513 F.2d 873 (5th Cir. 1975), presents

state involvement of considerably less magnitude than the present case.[7]

More important, there is a wide range of authority suggesting that the indicia of state involvement here, aside from partial funding and general regulation, are more than sufficient to support liability under § 1983. The most compelling factor is the power of the Milo selectmen to appoint the hospital's board of directors. Two Supreme Court cases, *Evans v. Abney*, 396 U.S. 435, 90 S.Ct. 682, 24 L.Ed.2d 634 (1970), and *Pennsylvania v. Board of Trustees*, 353 U.S. 230, 77 S.Ct. 806, 1 L.Ed.2d 792 (1956), found that discriminatory conduct by institutions of which city or state agencies are trustees was discrimination by the state. The fact that in the present case, the town of Milo only appointed the trustees as opposed to serving on the board itself, does not diminish this nexus between the hospital's operation and the town. In evaluating a private foundation, four of whose seven man board were appointed by state officers, the Second Circuit concluded:

6. Appellees Milo Community Hospital and Ava Strout cite the following cases in which hospitals were held *not* to be state actors: *Chrisman v. Sisters of St. Joseph of Peace*, 506 F.2d 308 (9th Cir. 1974) (hospital received 13% of its construction budget from Hill-Burton and HEW funds, received state tax exemptions, and was generally regulated by the state); *Ascherman v. Presbyterian Hospital of Pacific Medical Center*, 507 F.2d 1103 (9th Cir. 1974) (hospital received Hill-Burton funds and federal and state tax exemptions—no agency of the state selected or was represented on its governing board); *Briscoe v. Bock*, 540 F.2d 392 (8th Cir. 1976) (hospital was non-profit and tax exempt, was subject to extensive state regulation, received Hill-Burton funds, and was a member of a county health planning agency, (Alliance for Regional Community Health)); *Taylor v. St. Vincent's Hospital*, 523 F.2d 75 (9th Cir. 1975) (hospital was non-profit, received tax benefits and Hill-Burton funds, and was alleged to be the only hospital in the area); *Jackson v. Norton-Children's Hospital, Inc.*, 487 F.2d 502 (6th Cir. 1973) (hospital received Hill-Burton funds and was regulated by the state); *Doe v. Bellin Memorial Hospital*, 479 F.2d 756 (7th Cir. 1973) (hospital received Hill-Burton funds and was regulated by the state); *Allen v. Sisters of Saint Joseph*, 361 F.Supp. 1212 (N.D.Texas 1973) (hospital received Hill-Burton funds, was licensed by the state, received welfare funds,

and was tax exempt); *Barrett v. United Hospital*, 376 F.Supp. 791 (S.D.N.Y.1974) (hospital received Hill-Burton funds, was tax exempt, was subject to extensive state regulation).

7. In *Greco* the hospital facility, publicly financed and owned by the county, was leased for a *de minimis* fee to a non-profit, tax exempt hospital. The hospital was obligated by the lease to accept indigent patients but was given complete control over its medical policies and quality of care provided. In the case at bar, the hospital's board is, as we have noted, controlled by the town. Here also, the town has the right to receive profits and to the extent that the sterilization of indigents relieved both the town and the hospital of providing uncompensated obstetrical services and caring for indigent children in the future, the town did stand to benefit financially from the operation. Finally, it should be noted that the court in *Greco* (which divided on the issue of state action), concluded that the fact that the hospital was not accused of racial discrimination should make it more difficult to establish that the hospital was a state actor. As we have noted, *see* note 4 *supra*, we would, in this setting, equate racial discrimination with deprivation of a fundamental right for the purposes of state action analysis.

"Even indirect governmental participation in the management of an organization is persuasive evidence of the existence of 'state action' where that participation is both substantial and other than neutral . . . [H]ere public officials, named in their ex officio capacities, control the selection of a majority of the governing body, and the Buffalo Foundation appears to have established this procedure for the very purpose of involving the public in its activities. This participation is neither insignificant nor neutral. Therefore, as to the Buffalo Foundation, a finding of 'state action' may be warranted even if the court should find only some other significant evidence of 'state action'". *Jackson v. Statler Foundation*, 496 F.2d 623, 635 (2d Cir. 1974).

Other courts have also held that the appointment by the state of a majority of an institution's board is either determinative of state action or an important factor in establishing state action. *See Meredith v. Allen County War Memorial Hospital*, 397 F.2d 33 (6th Cir. 1968); *Chiaffitelli v. Dettmer Hospital, Inc.*, 437 F.2d 429 (6th Cir. 1971); *O'Neill v. The Grayson County War Memorial Hospital*, 472 F.2d 1140 (6th Cir. 1973); *Isaacs v. Board of Trustees of Temple University*, 385 F.Supp. 473 (E.D.Penn. 1974); *Braden v. University of Pittsburgh*, 392 F.Supp. 118 (W.D.Pa.1975). In *Aasum v. Good Samaritan Hospital*, 395 F.Supp. 363 (D.Ore.), aff'd, 542 F.2d 792 (9th Cir. 1976), the court concluded that the appointment of three of seven directors of the hospital's board by city, county and state officials did not make the hospital a state actor, but the court also specifically distinguished *Jackson v. Statler Foundation, supra*, as involving state appointment of a *majority* of the board, while the Oregon hospital only had a minority of its board appointed by the state. Similarly, we did not find the Rhode Island School of Design to be a state actor, although five of its forty-three directors were required to be

state or city officials.[8] *See Lamb v. Rantoul*, 561 F.2d 409 (1st Cir. 1977). The crucial fact, as noted previously, is that the town of Milo appoints the entire board of Milo Community Hospital.

Although the other aspects of state involvement do not appear to us to be as critical as the appointment of the Board of Directors, they nevertheless offer additional support for our conclusion. Other courts have found that ownership by the city or state of a reversionary interest in an institution's property is an important factor in finding state action. *See Hampton v. City of Jacksonville*, 304 F.2d 320 (5th Cir. 1962); *Eaton v. Gibbs*, 329 F.2d 710 (4th Cir. 1964). Moreover, the distribution of the hospital's profits, if any, to the town of Milo represents the very kind of mutually beneficial relationship which formed the basis of state action in *Burton*.

Appellees' reliance on *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), is not persuasive. The *Jackson* Court dealt with a private utility and held that the combination of extensive regulation by the state and a monopoly position do not justify a finding of "state action", unless "there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Id.* at 351, 95 S.Ct. at 453. If this nexus analysis was required to establish state action in any context, *Burton*, which based its holding on purely passive state involvement, would be overruled. However, *Jackson* specifically reaffirmed *Burton's* vitality in cases where, after searching scrutiny, a true symbiotic relationship can be said to exist. As the Second Circuit has explained:

"Although *Jackson* stressed the failure to establish that Pennsylvania was directly involved in the challenged activities of [the public utility]—an emphasis which was far from novel . . . the Court

---

8. On the other hand, in *Rivas Tenorio v. Liga Atletica Interuniversitaria*, 554 F.2d 492 (1st Cir. 1977), we found defendant athletic league to be a state actor despite its financial self-sufficiency in part because a majority of the league's directive board was composed of representatives of public institutions.

took pains to stress that the absence of any proof of state initiation or enforcement would not necessarily be dispositive in all cases. It recognized the continued viability of the principle enunciated in *Burton v. Wilmington Parking Authority* . . . and *Moose Lodge* . . . that where the state goes beyond mere regulation of private conduct, and becomes in effect a 'partner' or 'joint venturer' in the enterprise, the inference of state responsibility for the proscribed conduct could more easily be made." *Holodnak v. Avco Corp., Avco-Lycoming Div., Stratford*, 514 F.2d 285, 288 (2d Cir. 1975) (suit under § 301 of the Labor Management Relations Act, 29 U.S.C, § 185). *See also Braden v. University of Pittsburgh*, 392 F.Supp. at 125.

The essence of *Burton* which survives *Jackson* is that the relationship between the state and the private institution may be so intertwined that the state will be held responsible for conduct of the institution with which it had no direct connection.[9] In this respect the present case is similar to *Fortin v. Darlington Little League, Inc.*, 514 F.2d 344 (1st Cir. 1975), in which we held that despite the city's lack of participation in formulating the discriminatory policy of the defendant, there was sufficient involvement with defendant's activities in general to subject the defendant to the Fourteenth Amendment. Here, although Milo Community Hospital is not technically a lessee or privileged user of a public entity's facility, its position is no less intertwined. The town's appointment of the entire board, general governmental support and regulation of the hospital, the town's right to receive profits and, on dissolution, the hos-pital's assets, together constitute such a close relationship that the conduct of the hospital must be attributed to the government, even though a "nexus" in the *Jackson* sense is not present.[10]

The district court ruled that Dr. Curtis acted "in his capacity as a private practicing physician" in sterilizing plaintiff and as such his conduct was beyond the remedial scope of § 1983. Since summary judgment had already been granted for Milo Community Hospital, we do not know whether the district court's characterization of Dr. Curtis as a private party is a consequence of its earlier decision or whether the court believed that Dr. Curtis was acting in a private capacity even if the hospital was found to be a state actor.

■ Having determined that the hospital was a state actor, however, we must decide if the connection between Dr. Curtis and the Milo Community Hospital was such that the doctor's conduct should also be characterized as state action. Dr. Curtis was not simply a private physician making use of the hospital's facilities at the time of the sterilization operation. He was also Chief of Staff of the hospital. Article XVIII of the by-laws of the hospital state: "Responsibility for the operation and maintenance of the Hospital and evaluation of Hospital practices shall be a *joint effort* by the Board of Trustees, Administrator, and the Chief of Staff, *each to be a check on the other*." (Emphasis added.) Article V Sec. II of the By-Laws, Rules, and Regulations of The Medical Staff of Milo Community Hospital, Inc., describes the functions of the Chief of Staff even more explicitly: "He shall be responsible for the functioning of the clinical organization of the hospital and

---

9. *See Judicial Review of Private Hospital Activities*, 75 Mich.L.Rev. 445, 463 (1976) ("It would seem entirely proper, however, when no nexus is found, for a court then to weigh all the circumstances of the case and appropriately hold that the state is involved in the otherwise private activity to such a significant extent that state action must be found under *Burton*. It is this 'non obvious involvement of the state in [the] private conduct' that has been overlooked in many recent decisions, including perhaps the *Jackson* decision itself.")

10. There is evidence in the record to the effect that the town of Milo paid the expenses for the sterilization operation performed on the plaintiff. However, it is unclear to us how much, if any, discretion was exercised by the town in determining to make that payment. If not all indigents' hospital bills were paid by the town as a matter of course and if plaintiff's bill was paid as a matter of discretionary judgment, such facts would point to a nexus between the town and the hospital as to the specific conduct complained of.

shall keep or cause to be kept careful supervision over the clinical work of the hospital."

Just as agents and employees of state hospitals may be sued under § 1983, *see Fitzgerald v. Porter Memorial Hospital,* 523 F.2d 716, 718–19 n. 7 (7th Cir. 1975); *Spence v. Staras,* 507 F.2d 554 (7th Cir. 1974); *Harper v. Cserr,* 544 F.2d 1121 (1st Cir. 1976), agents and employees of private hospitals determined to be state actors are similarly liable. We do not see how Dr. Curtis can be held to be divorced from his official and responsible role at Milo Community Hospital simply because he is also administering directly to a patient.[11] As Chief of Staff of Milo Community Hospital with duties designated by its by-laws, Dr. Curtis must also be held to be subject to § 1983 liability.

■ In summary, we conclude that both the Milo Community Hospital[12] and Dr. Curtis were "state actors" for purposes of section 1983. The social workers were, of course, state employees at the time of their involvement in plaintiff's case and acted in their official capacities. Sawtelle also acted under color of state law, since her actions were taken in concert with state officials.

*Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Smith v. Brookshire Brothers, Inc.,* 519 F.2d 93, 94 (5th Cir. 1975). We must now determine if and to what extent any of these defendants are immune from liability for damages.

## II. IMMUNITY

Section 1983 provides that "[e]very person" who, acting under color of state law, deprives another of a constitutional right is answerable to the injured party in a suit for damages.[13] On its face, "[t]he statute thus creates a species of tort liability that . . admits of no immunities." *Imbler v. Pachtman,* 424 U.S. 409, 417, 96 S.Ct. 984, 988, 47 L.Ed.2d 128 (1976). On several occasions, however, the Supreme Court has rebuffed attempts to apply the statute as strictly as it reads. Specifically, the Court has held that legislators and judges enjoy absolute immunity from § 1983 damage liability for acts performed in their official capacities. See *Pierson v. Ray,* 386 U.S. 547, 554–55, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) and *Bradley v. Fisher,* 80 U.S. (13 Wall.) 335, 344–57, 20 L.Ed. 646 (1872) (judges); *Tenny v. Brandhove,* 341 U.S. 367, 372–79, 71 S.Ct. 783, 95 L.Ed. 1019 (1951) (legislators).

11. The cases cited by the trial court in its bench ruling do not persuade us to the contrary. *Joyce v. Ferrazzi,* 323 F.2d 931 (1st Cir. 1963) and *Byrne v. Kysar,* 347 F.2d 734 (7th Cir. 1965), both involve physicians whose only official relation to the plaintiff in their respective cases was in certifying him for commitment to a mental institution pursuant to state statutes. Here Dr. Curtis' responsibilities at Milo Community Hospital are of a general supervisory nature and cannot be ignored. In *Sebastian v. United States,* 531 F.2d 900 (8th Cir. 1976), claims against a legal aid attorney were dismissed because she was not acting under color of state law; but there is no discussion to indicate the basis for the court's conclusion. Also, hospital employees were held not to be liable under § 1983 both because they acted pursuant to a facially valid court order and because they were federal and not state employees. Again the decision of this case does not appear to be applicable to the facts before us.

12. In *Santiago v. Corporacion de Renovacion Urbana Y Vivienda de Puerto Rico,* 554 F.2d 1210 (1st Cir. 1977), we discussed whether the defendant, a public body created by the Com-

monwealth of Puerto Rico, was a "person" under section 1983 in light of *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) and *City of Kenosha v. Bruno,* 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973). Implicit in the entire discussion was the belief that aside from *Monroe v. Pape* municipal immunity, a corporate or institutional entity may be fully liable under section 1983. No party has suggested nor do we see any reason to conclude that Milo Community Hospital is not a person subject to suit for the purposes of this action.

13. The statute provides as follows:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

More recently the Court extended a similar immunity to prosecutors for actions taken in connection with "initiating a prosecution and . . . presenting the State's case." *Imbler v. Pachtman, supra,* 424 U.S. at 431, 96 S.Ct. at 995.

These decisions were grounded in part upon the reasoned conclusion that in enacting § 1983 the Reconstruction Congress did not intend "to abolish wholesale all common-law immunities." *Pierson v. Ray,* 386 U.S., *supra,* at 554, 87 S.Ct. at 1218. To date, however, the Court has jealously guarded the protection accorded judges, legislators and prosecutors to the extent that no other state officials have been cloaked with absolute immunity. Instead the Court has sanctioned a "qualified immunity" which shields certain state actors from damage liability for official actions found to have been taken in "good faith." *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Pierson v. Ray, supra.* As the Court said in *Wood,* an official entitled to assert the immunity will be subject to liability for damages under § 1983.

> "if he knew or reasonably should have known that the action he took within the sphere of his official responsibility would violate the constitutional rights of the [plaintiff], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the [plaintiff]. . . . A compensatory award will be appropriate only if the [defendant] . . . acted with such an impermissible motivation or with such disregard of the [plaintiff's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith." 420 U.S. at 322, 95 S.Ct. at 1001. (citation omitted).

As stated, the inquiry is comprised of both objective and subjective components. And although the test was announced in the specific context of the liability of school board members for acts of "school discipline", it is beyond dispute that a much broader range of officials and official actions are included within the test's reach. *See O'Connor v. Donaldson,* 422 U.S., *supra,* at 576–77, 95 S.Ct. 2486.

Since *O'Connor* and *Wood,* the courts of appeals have displayed little hesitancy in extending the qualified immunity to a variety of officials, including: (1) parole officers, *Wolfel v. Sanborn,* 555 F.2d 583, 591 (6th Cir. 1977); (2) jailers, *Bryan v. Jones,* 530 F.2d 1210, 1213–15 (5th Cir.) (en banc), *cert. denied,* 429 U.S. 865, 97 S.Ct. 174, 50 L.Ed.2d 145 (1976); (3) state bank officials, *Guzman v. Western State Bank of Devils Lake,* 540 F.2d 948, 951–52 (8th Cir. 1976); (4) correctional administrators, *Knell v. Bensinger,* 522 F.2d 720, 725 (7th Cir. 1975); and (5) police officers, *Foster v. Zeeko,* 540 F.2d 1310, 1314 (7th Cir. 1976). Perhaps in part because of the readiness with which the courts have sanctioned *Wood's* application, the district court in this case presumed that the three social workers and Dr. Curtis were entitled to assert a qualified immunity.

We do not disagree with the district court's conclusion that a physician in Dr. Curtis' position should be permitted to assert a qualified immunity defense, *see O'Connor v. Donaldson, supra.* As to the merits of his defense, we have no difficulty in holding that a member of the medical profession reasonably should be aware that irrevocably terminating a patient's ability to bear children without her consent is a deprivation of a fundamental constitutional right. *See generally Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), as to primacy of the right to bear and raise children.

What is less clear here is whether or not there was sufficient evidence for a jury to determine that there was no free and informed consent and that this lack of con-

sent was intelligibly communicated to Dr. Curtis. If Dr. Curtis negligently interpreted plaintiff's communications to indicate she consented to the operation he is not liable under the standards enunciated in *Wood*, even if plaintiff did not intend to consent. However, if a jury could reasonably conclude that Dr. Curtis determined that sterilizing the plaintiff was for her own good or the good of society and as a consequence of that belief ignored indications from the plaintiff that she did not consent to the operation, or if it could conclude that he attempted to take advantage of her mental and communication limitations to unduly influence her decision, he would be liable under both components of the *Wood* test. He should reasonably have known that such conduct amounted to an unconstitutional deprivation and he would be acting with a malicious motive. The fact that the doctor thought he had plaintiff's best interests at heart would not justify a qualified immunity for constitutional purposes any more than would the belief, if asserted by a discriminatory employer or educator, that minority group members are happier and more productive in a segregated environment.[14]

■ The district court's bench ruling directing a verdict for Dr. Curtis did not elaborate on its finding that "plaintiff has failed to meet her burden of showing that Dr. Curtis acted with malice or otherwise in bad faith." In reviewing this conclusion we must reverse the district court's judgment if "the evidence, viewed in the light most favorable to the party against whom the motion for directed verdict is made, is such

that fair-minded men may draw different inferences therefrom and reasonably disagree as to what the verdict should be . . . ." *Arnold v. Aetna Engineering Co.*, 514 F.2d 1147, 1148 (1st Cir. 1975). We find that there is sufficient evidence for reasonable men to disagree as to Dr. Curtis' intentions and that this issue should be presented to the jury.

■ A jury could conclude (1) that Dr. Curtis believed plaintiff to be promiscuous, of low intelligence and easily influenced, and that he concluded that her sterilization would be in her best interest; (2) that as a consequence of that belief, he deliberately ignored repeated indications from plaintiff and her fiance that they did not want the operation to take place; (3) that for the same reason the doctor failed to take any of the precautionary steps that might have prevented the operation, *i. e.* that he did not call the probate judge to determine if plaintiff's guardian could legally consent to the sterilization,[15] he did not obtain plaintiff's signature on the sterilization permit, and he accepted without dispute advisory reports from his colleagues that included non-medical conclusions of a speculative and prejudicial nature; and (4) that Dr. Curtis took advantage of plaintiff's difficulty in communicating and impressionable nature to manipulate her into consenting to the operation.

■ In evaluating the doctor's conduct we may take cognizance of the extraordinary degree of helplessness of the plaintiff. Malice for constitutional purposes includes "callous" or "wanton neglect", *Harper v.*

---

**14.** See *Duchesne v. Sugarman*, 566 F.2d 817, 828 (2d Cir. 1977) ("Nevertheless, '[o]f all tyrannies a tyranny sincerely exercised for the good of its victims may be the most oppressive . . . [T]hose who torment us for our own good will torment us without end for they do so with the approval of their own conscience.' Goldstein [Medical Care for the Child at Risk: On State Supervention of Parental Autonomy, 86 Yale L.J. 645 n. 19 (1977)], *quoting*, Lewis, *The Humanitarian Theory of Punishment*, 6 Res Judicatae 224, 228 (1952).").

**15.** Even though he did not attempt to determine if he had a legal basis to perform the

operation, it might be that a spendthrift guardian, *appointed under* 18 M.R.S.A. § 1801, has authority to consent. *But see Wade v. Bethesda Hospital*, 356 F.Supp. 380, 383 (S.D.Ohio 1973). In such event, the doctor would have acted in accordance with the statute. This being the case, there could be a deprivation of plaintiff's constitutional rights only if the statute were to be held unconstitutional at least as applied here. *See generally Sparkman v. McFarlin*, 552 F.2d 172, 173 (7th Cir. 1977), rev'd sub nom., *Stump v. Sparkman*, —— U.S. ——, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978). We express no position on this issue at this time.

*Cserr*, 544 F.2d, *supra*, at 1121, and " 'reckless indifference to the rights of the individual citizen' ", *Kelley v. Dunne*, 344 F.2d 129 (1st Cir. 1965). Whether conduct is wanton or reckless depends in part on the context in which it occurs, and this includes the inability of the victim to protect himself.

We do not intimate that any of the above inferences are true. The evidence that supports them is in dispute. In many cases conflicting inferences can be drawn from the same set of facts. We are solely concerned with the possibility that, given the condition of the plaintiff and the evidence described, reasonable men could come to the conclusion that the doctor did not act in good faith.[16] As the Second Circuit noted recently in *Duchesne v. Sugarman, supra*, in a complicated § 1983 suit against welfare employees and child care institutions for taking custody of two children without their mother's consent, "the issue of good faith presents questions of fact which are peculiarly within the jury's province." We think that generalization is equally applicable to this case. Plaintiff should be given the opportunity to convince a jury that she has a right to recover damages for the injury she alleges.

 The district court also assumed that the state social workers were entitled to rely upon the good faith immunity. Based upon our reading of the Supreme Court's decisions in this area, we believe that such an assumption was improper.[17] As we interpret the existing precedent, the Court has never attempted to articulate a wholesale immunity for all state officials. As the Court recently explained in *Imbler*, the

> "earlier decisions on § 1983 immunities were not products of judicial fiat that officials in different branches of government are differently amenable to suit

under § 1983. Rather each was predicated upon *a considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it.*" 424 U.S. at 421, 96 S.Ct. at 990. (emphasis added).

The requisite inquiry thus is two-fold. As an initial matter, the district court should consult the common law to determine whether or not the particular official sued has traditionally been accorded any sort of immunity in actions comparable to the cause of action asserted under § 1983. For example, in *Pierson* the Court held that

> "the defense of good faith and probable cause, which the Court of Appeals found available to [police] officers in the common-law action for false arrest and imprisonment, is also available to them in the action under § 1983." 386 U.S. at 557, 87 S.Ct. at 1219.

And in *Wood*, the grant of a qualified immunity to the school officials sued there was based in part upon the finding that

> "[a]lthough there have been differing emphases and formulations of the common-law immunity of public school officials in cases of student expulsion or suspension, state courts have generally recognized that such officers should be protected from tort liability under state law for all good-faith nonmalicious action taken to fulfill their official duties." 420 U.S. at 318, 95 S.Ct. at 999. (footnote omitted).

In light of the significant role played by an analysis of relevant common-law principles in the Supreme Court's decisions, no less can be required each time a lower court seeks to extend the immunity to yet another category of officials.

[11] The second phase of the analysis recognizes that the common-law tradition

---

**16.** Reversal of the directed verdict granted the doctor is limited to the cause of action for sterilizing plaintiff. Because the doctor was not involved in postponing plaintiff's marriage or removing the second child from her custody, we affirm so much of the district court ruling as directed a verdict for the doctor on those allegations.

**17.** Sections I and III of this opinion reflect the unanimous judgment of the court, as does the discussion of Dr. Curtis' immunity in Section II. The balance of Section II, which treats the purported immunity of the social workers and Roberta Sawtelle, reflects the judgment of the majority, Judges Tuttle and Wollenberg. Chief Judge Coffin dissents from this portion of Section II.

may not always serve as an infallible guide. When necessary, the Court has exhibited a willingness to make available a qualified immunity "to avoid discouraging effective official action by public officers charged with a considerable range of responsibility and discretion." *Wood v. Strickland*, 420 U.S. at 317–18, 95 S.Ct. at 998–99. That an element of public policy is in some instances inherent in the inquiry was made clear in *Scheuer*, where the Court summarized as follows:

"This official immunity [of government officials] apparently rested, in its genesis, on two mutually dependent rationales: (1) the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion; (2) the danger that the threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment required by the public good." 416 U.S. at 239–40, 94 S.Ct. at 1688.

Against this background, the Court went on to hold that in each instance the immunization available depends upon the "scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action" for which relief is sought. *Id.* at 247, 94 S.Ct.

at 1692. In this context, the qualified immunity rests in part upon the idea that public policy requires that certain officials be able to perform their discretionary duties without having to fear that good-faith errors in judgment may ultimately result in damages liability.

■ Neither the Supreme Court nor this court has ever held that state social workers are entitled to assert a qualified immunity.[18] As previously indicated, the district court merely presumed that· such was ·the case. Consequently, the "considered inquiry" referred to in *Imbler* was never undertaken. The exacting nature of the task imposed requires that the defendants first be given an opportunity to develop the relevant factual data and legal principles, thus providing the district court a proper basis for decision. It may well be that if this court is subsequently called upon to review the findings made in this regard, these defendants' beliefs in the availability of a qualified immunity will be sustained. However, in the absence of any factual development as to the nature of the positions involved and the range of responsibilities committed to these defendants, it would be inappropriate at this point for this court to attempt to answer such a crucial question.[19]

---

**18.** One court has applied the *Wood* standards in a § 1983 action against "supervisory level municipal welfare employees." *Duchesne v. Sugarman*, 566 F.2d 817 (2d Cir. 1977). However, the opinion in that case suffers from the same lack of analysis evidenced in the instant case.

**19.** Only if the district court is able to conclude that the social workers are entitled to rely upon a good faith defense will the sufficiency of plaintiff's proof of bad faith be called into issue. In this regard, we reiterate that summary disposition is peculiarly inappropriate in cases in which motive and intent play a leading role. And, while our resolution of the immunity issues makes it unnecessary to pass upon the sufficiency of plaintiff's proof, we note that our review of the record indicates that her claims against the social workers should be resolved by the jury.

We do not believe that our requiring the district court to examine the common law, the nature of the office involved, and the relevant policy considerations before extending the

good faith immunity to yet another class of state officials is inconsistent with the recent decision in *Procunier v. Navarette*, —— U.S. ——, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978). Although one of the dissenters in *Procunier* suggested that the majority opinion there, when "coupled with *O'Connor v. Donaldson . . ,* strongly implies that every defendant in a § 1983 action is entitled to assert a qualified immunity from damage liability", *id.* 98 S.Ct. at 863. (Stevens, J., dissenting), we do not share that view.

The defendants in *Procunier* were state prison officials, and, as stated in the majority opinion: "The courts of appeals have generally accorded prison and jail administrators performing discretionary functions a qualified immunity from monetary liability under § 1983." *Id.* at 859 (citations omitted). Although the Court's conclusion that the defendants before it were entitled to rely upon the good faith immunity was not predicated upon the "reasoned analysis" undertaken in prior cases, such an analysis was not necessary under the circum-

There remains then only the asserted immunity of Roberta Sawtelle, whose role in the operation and the taking of plaintiff's child was played in concert with Dr. Curtis and the social workers. Even if the district court is able to conclude that the officials are protected by some qualified immunity, Sawtelle is not entitled to benefit from such a holding.

In *Adickes v. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), the plaintiff alleged in a § 1983 action for damages a deprivation of her Fourteenth Amendment equal protection rights as a result of concerted action between certain police officers and a public restaurant facility. *Id.* at 146–47, 90 S.Ct. 1598. The Supreme Court held that the district court had erred in granting summary judgment against the plaintiff and explained:

"The involvement of a state official in . . . a conspiracy [with a private party] plainly provides the state action essential to show a direct violation of petitioner's Fourteenth Amendment equal protection rights, *whether or not the actions of the police were officially authorized or lawful*; . . . Moreover, a private party involved in such a conspiracy, even though not an official of the State, can be liable under § 1983." *Id.* at 152, 90 S.Ct. at 1605 (citations omitted) (emphasis added).

The significance of this holding becomes apparent only when considered in the context in which it was announced—the plaintiff sought damages from the private party alone, and neither the state nor any state official was joined as a defendant. It is thus plain that once the requisite showing of concerted action is made, and assuming that some colorable constitutional deprivation is made out, the injured party has an independent cause of action for damages against the private party involved. The ultimate destiny of the private party can in no way be said to depend upon the status of the official with whom he conspired or upon the defenses available to that official. The concerted action which permits a finding of state action cannot simply be erased by the absence of the state actor as a defendant or by the fact that the state actor might later raise a successful defense to the plaintiff's claim.

Nor can it be said that a private individual shown to have acted in concert with state officials may rely upon any type of qualified immunity, whether derivatively or otherwise. In *Monroe v. Pape*, 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961), the Supreme Court held that § 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." In the case of public officials, the Court has reasoned that a "good faith" qualified immunity is an integral part of this background. *Pierson v. Ray*, 386 U.S. at 556–57, 87 S.Ct. 1213, and that certain officials are therefore entitled to rely upon such an immunity. But the Court has never held that private individuals are in any way shielded from damage liability in a comparable fashion. To the contrary, the Court in *Adickes* recognized the plaintiff's right to proceed solely against the private defendant, despite the fact that three years earlier the Court had sanctioned a qualified immunity for the police officers with whom the defendant allegedly had conspired. *See Pierson v. Ray, supra.*

To place this court's imprimatur upon an immunity in favor of a private individual could in many instances work to eviscerate the fragile protection of individual liberties afforded by the statute. Private parties simply are not confronted with the pressures of office, the often split-second decisionmaking or the constant threat of liability facing police officers, governors and other public officials. Whatever factors of policy and fairness militate in favor of extending some immunity to private parties acting in concert with state officials

stances. Prior to *Procunier* there had developed in the circuits a substantial body of law as to the right of prison officials to assert a quali-

fied immunity under the terms and scope of *Wood*. No such precedent exists with respect to the type of state official sued in this case.

were resolved by Congress in favor of those who claim a deprivation of constitutional rights. Consequently, we hold that the *Wood* defense is not available to Roberta Sawtelle and that her liability is to be determined by the jury without regard to any claim of good faith.

### III. THE § 1985 CLAIM

 Plaintiff has failed to present authority for her assertion that the deaf constitute a class for the purposes of 42 U.S.C. § 1985. Even if such a class is cognizable, *but see Bricker v. Crane*, 468 F.2d 1228 (1st Cir. 1972), plaintiff has not established that her membership in it was the cause of the alleged discrimination against her. *See Harrison v. Brooks*, 519 F.2d 1358 (1st Cir. 1975). The district court properly dismissed the § 1985 claim against all defendants.

*Affirmed in part, reversed in part, and remanded.*

COFFIN, Chief Judge, dissenting.

I respectfully dissent from that part of the majority opinion relating to the immunity of Roberta Sawtelle, and the three defendant social workers. The majority contends that public officials should receive absolute or qualified immunity from § 1983 liability only if common law traditions of immunity or public policy interests in protecting the free exercise of official discretion are found to require the extension of such protection to particular classes of officials. As an abstract proposition, this approach has a certain attraction. But at the present time a significant body of case law has developed concerning who is eligible for immunity. Reasonable inferences from these precedents convince me that a remand is unnecessary on this issue and that social workers fall within the range of those permitted to assert the qualified immunity detailed in *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975).

The majority acknowledges that the Supreme Court has extended qualified immunity to include hospital administrators, school officials, police officers, prison officials, and executive officers. Lower courts have applied the *Wood v. Strickland* test to parole officers, correctional staff, and even state bank officials. I fail to see why one would doubt that social workers would be included within this official continuum. There seems little basis for distinguishing them in terms of the public policy rationale, and social workers are a new enough profession to make it unlikely that relevant common law traditions will shed light on their status. Rather than remand for a determination whether or not the social workers were entitled to assert a qualified immunity defense, I would hold that they are and proceed directly to the question whether sufficient evidence has been presented to reach the jury as to their subjective and objective "bad faith". However, in light of the majority's disposition of this issue, I express no opinion as to whether the record supports a directed verdict on the immunity question.

My second point of disagreement with the majority concerns the liability of Roberta Sawtelle. It is by no means clear to me that a private party allegedly acting in concert with state actors should be subject to damages, if the state actors can successfully assert a qualified or absolute immunity. The majority's analysis based on the *Adickes* case is not without merit. And I share the desire to avoid any erosion of the protections afforded citizens by § 1983. But both a sense of fairness and public policy caution against adopting an inflexible rule permitting private parties to be held liable when relevant and perhaps critically important state actors are immune. Particularly strong is the case for not imposing liability on a private person when his state actor collaborator has not manifested sufficient bad faith to breach a qualified immunity. Therefore, to the extent the state actors with whom Ms. Sawtelle allegedly acted in concert are found to be immune under *Wood v. Strickland*, I would hold that the corresponding claims against Ms. Sawtelle should be dismissed.