Alfred WILSON et al., Plaintiffs, Appellees,

v.

NOOTER CORPORATION, Defendant and Third-Party Plaintiff, Appellant,

v.

The H. K. FERGUSON COMPANY, Third-Party Defendant, Appellee.

No. 72–1308.

United States Court of Appeals, First Circuit.

Heard Dec. 6, 1972.

Decided March 13, 1973.

Martin L. Gross and John C. Ransmeier, Concord, N. H., with whom Sulloway, Hollis, Godfrey & Soden, Concord, N. H., was on brief, for appellant.

Kurt M. Swenson and Dort Bigg, Manchester, N. H., with whom Wiggin, Nourie, Sundeen, Pingree & Bigg, Manchester, N. H., was on brief, for Alfred Wilson and Robertina Wilson, appellees.

Joseph F. Devan, Manchester, N. H., with whom Sheehan, Phinney, Bass & Green, Manchester, N. H., was on brief, for The H. K. Ferguson Company, appellee.

Before ALDRICH, McENTEE and CAMPBELL, Circuit Judges.

CAMPBELL, Circuit Judge.

Appellee Ferguson was the general contractor for the construction of a brewery in Merrimack, New Hampshire. Appellant Nooter, a boilermaker, was the sub-contractor in charge of erecting a large vat.

Appellee Wilson, a brick mason and Ferguson employee, was injured when Ferguson's crane, operated by a Ferguson employee, snagged a cable holding up the scaffold upon which Wilson worked. Nooter had called in the crane to lift a heavy beam from the building which housed the vat.

Wilson and his wife sued Nooter in the district court; Nooter brought a third-party complaint against Ferguson for indemnity. Trial was before a jury of six, as required for civil cases by the district court's local rule 30. At the close of all the evidence on liability, the court directed verdicts for Wilson and his wife against Nooter, and for Ferguson against Nooter. The jury then assessed damages. Nooter has appealed.

■ The principal issue is whether the district court erred in withholding from the jury the question whether Ferguson's employees operating the crane had become Nooter's borrowed servants, such that Nooter was liable for their negligence, if any, as well as for any negligence on the part of its own employees. On this question, New Hampshire law applies. Erie Railroad v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). We hold that the question should have been submitted to the jury, and accordingly remand for a new trial on liability.

Nooter, which owned cranes but had no crane at the job site, at times used a Ferguson crane, paying therefor by accepting a back charge from Ferguson. The crane operator and the oiler (who cleaned the machine and assisted the operator) were both Ferguson employees, subject to discharge and paid by Ferguson. Nooter could, however, reject an operator if not satisfied with him.

On the present occasion, Nelson, an assistant foreman for Nooter, had asked Hall, a licensed crane operator in Ferguson's employ, to bring the crane at his convenience to lift the heavy steel beam. One or two days thereafter, Hall, accompanied by his oiler, Bugay, appeared at the site in the crane, valued at $65,000, with a 100-foot boom and a 50-ton lifting capacity. The boom could be raised or lowered and moved laterally.

The beam was lying on the third floor near the easterly side of the building. The east wall was in the process of completion, and the beam had to be removed while access remained. Wilson was working on the east wall from a scaffold suspended by vertical cables fastened to the beams of the roof of the building. The cables were hung in pairs, the cable nearer the wall supporting the inner edge of the platform, the outer cable supporting the outer edge. The pairs were spaced five to eight feet apart along the scaffold. The space between the pairs of cables was called a "bay".

Nelson pointed out to Hall where the boom had to go to make the hoist. Its tip had to be inserted through a bay. Hall decided where to place the crane, positioning it as close to the building as possible. The oiler, Bugay, directed Hall as he swung the boom down to clear the overhang of the roof. (Bugay's attention thereafter was distracted, and he did not see the events following.) Then Hall, following signals from Nelson, who was on the third floor, lowered the boom so that its tip was in the bay. Hall could not see the beam from the cab, although it could be inferred that he could see Wilson, the scaffold, and its supporting cables. About 2½

feet separated the boom from the cables on either side of it. Hall did not lock the boom to prevent sideways motion, although he could have done so.

Nelson signaled Hall to lower the hoisting cable, and, with another Nooter employee, Beatty, attached the hook on the cable to the beam. Nelson then signaled for short hoists so that the beam could be properly positioned to be lifted from the building. Finally, Nelson signaled Hall to raise the boom to lift the beam out. He gave no signal for lateral motion of the boom. As the tip of the boom came out of the bay, a protruding pin on the side of the boom snagged one of the scaffold support cables, pulling the scaffold away from the building. Wilson, standing on the scaffold, hung onto the wall. The cable came free of the boom, the scaffold swung back, and struck and injured Wilson. The entire operation had consumed about two hours.

The district court, in directing a verdict for Wilson and for Ferguson, ruled as a matter of law that at the time of the accident, Hall and the oiler were borrowed servants of Nooter, making Nooter responsible for any negligence, in whole or in part, that may have contributed to the accident. It emphasized that "as a matter of law" they were acting under Nooter's direction and control, so that even if one or both were found wholly responsible for the accident, Nooter would still be liable.

Borrowed servant law is extraordinarily troublesome. *See generally* T. Smith, "Scope of the Business: The Borrowed Servant Problem," 38 Mich.L.Rev. 1222 (1940). In New Hampshire, the "fundamental test" for determining liability for the negligence of a general employer's servant doing work for another is "who exercised the 'right of control over the performance of that work to the extent of prescribing the manner in which it is to be executed.'" Currier v. Abbott, 104 N.H. 299, 304, 185 A.2d 263, 267 (1962), citing Restatement of Agency 2d §§ 220(1), 227. *See also* Hunter v. R. G. Watkins

& Son, Inc., 110 N.H. 243, 246, 265 A.2d 15, 17 (1970) (dictum). Right of control is determined, according both to the New Hampshire cases and to the Restatement, which they cite, as a "question of fact" (Restatement, § 227) by marshalling and weighing a variety of factors, no one of which is controlling and all of which are to be considered.

Several of the factors recognized in the New Hampshire cases, and in the Restatement, could lead a jury to conclude that the right to control remained in Ferguson. Hall operated a machine of considerable value and complexity; where, during the job, the interests of Nooter conflicted with those of Ferguson, it might be expected that Hall would protect Ferguson's interests in the use of the machine. Hall and Bugay remained subject to discharge only by Ferguson, and only Ferguson could substitute other operators for them. The period of hire was brief. Hall decided where to place the crane, and Hall and Bugay on their own lowered the boom under the roof overhang. Hall, a licensed operator, had the skill of a specialist, making decisions such as whether to lock the boom to prevent sideways motion. *See generally* Golding-Keene Co. v. Fidelity-Phenix Fire Insurance Co., 96 N.H. 64, 70, 69 A.2d 856, 860 (1949); Restatement of Agency 2d § 227, comment c.

■ Other, admittedly not inconsiderable, factors suggest a shift of the right to control to Nooter. Thus, Nooter's man, Nelson, told Hall where to place the boom, and directed Hall in the lifting of the beam. During the part of the job most directly connected with the accident, Hall, unable to see the beam, acted in response to Nelson's signals.[1] That Ferguson was not in the business of renting cranes but merely permitted (though not gratuitously) Nooter to use the crane would support an inference that Ferguson intended to surrender control. *See generally* Currier v. Ab-

bott, supra, 104 N.H. at 303–304, 185 A. 2d at 266–267; Restatement of Agency 2d § 227, comments c and d.

■ The balance of factors is further complicated by the rule, "There is no inference that because the general employer has permitted a division of control, he has surrendered it." Restatement of Agency 2d § 227, comment b. *See* Cardozo, J., in Charles v. Barrett, 233 N.Y. 127, 129, 135 N.E. 199, 200 (1922).

■ In New Hampshire law it is for the jury to weigh the factors and decide which employer exercised the right to control. The borrowed servant question "[is] a question of fact . . . upon which the finding of the Trial Court cannot be disturbed if there is evidence to sustain it." Indemnity Insurance Co. of North America v. Cannon, 94 N.H. 319, 321, 52 A.2d 855, 856 (1947). *See also* Restatement of Agency 2d § 227, comment a. Proponents' verdicts are rarely directed in New Hampshire and in the federal courts; they are not directed, even on undisputed evidence, if the evidence gives rise to conflicting inferences. Boothby v. Prescott, 97 N.H. 504, 505, 92 A.2d 661, 662 (1952); Federal Insurance Company v. Summers, 403 F.2d 971, 975–976 (1st Cir. 1968). Here, although there is much support for the district court's conclusion, we think a jury could, by attaching different weight to certain factors, have permissibly reached a different result. Like the court in Dickerson v. American Sugar Refining Co., 211 F. 2d 200, 202 (3rd Cir. 1954), construing Pennsylvania borrowed servant law, we think that the evidence, taken as a whole, is subject to inconsistent inferences, and that, under New Hampshire law, these must be resolved by the jury.

We are aware of no New Hampshire case in which a directed verdict on this question was sustained. In Currier v. Abbott, *supra*, a case relied on by appellees, the court, although affirming a

---

1. It has been said, however, that a signalman's giving of signals to a winch operator "was not the giving of orders, but of information, and [that] the obedience to those signals showed co-operation rather than subordination. . . ." Standard Oil Co. v. Anderson, 212 U.S. 215, 226, 29 S.Ct. 252, 256, 53 L.Ed. 480 (1909).

jury verdict holding liable the temporary employer, Abbott, said: "Upon the evidence in this case it could not be said that whatever Pratt did while hired out to Abbott 'must' as a matter of law be considered done in the service of Abbott." 104 N.H. at 303, 185 A.2d at 266.[2] Golding-Keene Co. v. Fidelity-Phenix Insurance Co., 96 N.H. 64, 69 A. 2d 856 (1949), and Mead v. Travelers Insurance Co., 111 N.H. 27, 274 A.2d 792 (1971), involved affirmation of findings by a master and a trial court, respectively, and do not stand for the proposition that such findings were required as a matter of law.

Doubtless there may be a case where, notwithstanding the existence of a few factors looking the other way, the bulk of the evidence is so strong in one direction as to permit but one inference. But we cannot say this is that case. The tortuous history of "borrowed servant" reflects different emphases by different courts and commentators on the weight to be given different factors. The variety of emphases stems from conflicting judgments of policy: is it reasonable most often to impose liability upon the general employer, who hired and selected the man? Should it rather be placed upon the one whose immediate interests were being served at the time of the accident? New Hampshire, like some but not all jurisdictions,[3] has decided to leave the marshalling and weighing of the factors, and the unavoidable policy judgments lurking beneath the surface of the amorphous "control" test, to a properly instructed jury. We think we must leave them there.

Since we remand for a new trial, we shall deal briefly with two other issues raised by Nooter, finding merit in neither.

We agree with the district court that any liability of Nooter attributable solely to its "borrowed servant" responsibility for the Ferguson employees' negligence cannot be recovered back from Ferguson on a theory of implied warranty of workmanlike performance. It would be odd indeed for the law, having under one of its principles shifted responsibility for their negligence to Nooter, to shift it back to Ferguson by an implication.

Nooter relies on cases that one who entrusts a nondelegable duty with respect to his premises to a third person, usually an independent contractor, and is held liable for a breach thereof, may recover from the third party for any breach of an implied obligation to perform the job with care and in a workmanlike manner. Wentworth Hotel, Inc. v. F. A. Gray, Inc., 110 N.H. 458, 272 A.2d 583 (1970); Sears, Roebuck & Company v. Philip, N.H., 294 A.2d 211 (1972); Westchester Lighting Co. v. Westchester County Small Estates Corp., 278 N.Y. 175, 15 N.E.2d 567 (1938); Ryan Stevedoring Company v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). See Restatement of Restitution § 95. But a necessary aspect of the cited cases is that the third-party contractor, or his employee, remains independent of the man for whom he is performing the job. Liability of Nooter for Hall's negligence, on the other hand, would rest on the finding that Hall lost his independence and, coming under the control of Nooter, became its servant.

Finally, we deal with Nooter's contention that the United States and the New Hampshire constitutions, 28 U.S.C. § 2072, and Federal Rules of Civil Procedure 38, 48 (see F.R.C.P. 83), all prohibit a district court's unilateral reduction in the size of the 12-man jury.

---

2. The court also said, 104 N.H. at 305, 185 A.2d at 268, ". . . the evidence plainly presented issues for the jury, . . ." and cited Balcus v. Sterling Express Company, 93 N.H. 428, 43 A.2d 155 (1945), where, on conflicting testimony as to the terms of an agreement concerning a borrowed servant, the trial court was held to have erroneously directed a verdict against the general employer.

3. Cf. Nepstad v. Lambert, 235 Minn. 1, 50 N.W.2d 614 (1951); Kessler v. Bates & Rogers Construction Co., 155 Neb. 40, 50 N.W.2d 553 (1951).

█ Nooter mounts this argument in the face of strong authority against it.[4] If, as the United States Supreme Court held in Williams v. Florida, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), the Sixth Amendment guarantee of jury trial in criminal cases did not freeze for all time the number of jurors at twelve, we see no reason, in history or policy, for holding that that number is frozen into the civil jury requirement of the Seventh Amendment. As Judge Wisdom said in Cooley v. Strickland Transportation Company, 459 F.2d 779, 781 (5th Cir. 1972), *petition for rehearing and petition for rehearing en banc denied,* "no one has ever contended that the function of the civil jury is *more* important than that of the criminal jury. . . . It would be anomalous to the point of irrationality to construe the Constitution as sanctioning a six-member criminal jury but not sanctioning a six-member civil jury." *Accord,* Colgrove v. Battin, 456 F.2d 1379 (9th Cir. 1972), cert. granted, 409 U.S. 841, 93 S.Ct. 44, 34 L.Ed.2d 80 (1972). We further agree with Judge Wisdom that the use of "at common law" in the Seventh Amendment merely distinguishes common law from equity and admiralty cases for purposes of the jury trial requirement, and does not imply a requirement that the jurors number 12. *See* 459 F.2d at 781–782.

█ Neither do we think that the enabling act, 28 U.S.C. § 2072, commits the Supreme Court, in promulgating the Federal Rules, to the preservation of 12-man juries.[5] We agree with the Fifth and Ninth Circuits that this language was meant merely to preserve jury trials in common law cases upon the merger of law and equity. *See* Colgrove v. Battin, *supra,* 456 F.2d at 1380–1381; Cooley v. Strickland Transportation Company, 459 F.2d at 785–786. We see nothing in rule 30 inconsistent with Federal Rules 38(a) and 48. *See Colgrove,* 456 F.2d at 1381; *Cooley,* 459 F.2d at 783–785.

█ Alternatively, appellant argues that under Erie Railroad v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L. Ed. 1188 (1938), the size of the jury is a state law question, and that the New Hampshire Constitution[6] requires a 12-man jury, citing such ancient cases as Opinion of the Justices, 41 N.H. 550 (1860), and Copp v. Henniker, 55 N.H. 179 (1875). These cases, it is true, refer to the view, doubtless then well-nigh universal, that juries consist of 12 men. They do not, however, focus on all the issues raised in *Williams,* and do not leave us convinced that New Hampshire, should the question arise today, would not rethink the matter. *See* Opinion of the Justices, 1971 Mass.A.S. 1169, 271 N.E.2d 335 (1971). Thus, we do not accept the premise that a 12-man jury (as distinct from a jury) is today an "integral" part of the state-created right. *See* Byrd v. Blue Ridge Electric Cooperative, Inc., 356 U.S. 525, 536, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958). Further, even the so-called outcome-determinative test would not lead to application of state law, since, as the Supreme Court said in *Williams,* 399 U.S. at 101, 90 S. Ct. at 1906, there is "no discernible difference between the results reached by the two different-sized juries." *See Byrd, supra,* 356 U.S. at 356–357, 539–540, 78 S.Ct. 893. Finally, even if outcomes might be different, we reject ap-

---

4. The Supreme Court has, however, yet to *rule directly. Colgrove v. Battin, infra,* cert. granted 409 U.S. 841, 93 S.Ct. 44, 34 L.Ed.2d 80 (1972).

5. The act says, in part:
    "Such rules shall not abridge, enlarge or modify any substantive right and shall preserve the right of trial by jury as at common law and as declared by the Seventh Amendment to the Constitution."

6. "[Art.] 20th. [Jury Trial in Civil Causes.] In all controversies concerning property—and in all suits between two or more persons, except in cases in which it has been heretofore otherwise used and practiced, and except in cases in which the value in controversy does not exceed five hundred dollars, and title of real estate is not concerned the parties have a right to a trial by jury and this method of procedure shall be held *sacred,* . . . ."

504

pellant's argument that, upon a balancing of state and federal interest, the federal policy favoring the six-member jury is not "strong." *See Byrd, supra,* 356 U.S. at 537–539, 78 S.Ct. 893. Apart from the not insignificant issues of expense and inconvenience given today's crowded dockets, we think that it would appear fortuitous and arbitrary for civil litigants in the same federal court to be confronted with different sized juries depending on whether their cause of action is denominated federal or state.

There must be a new trial on the issue of Nooter's liability; and we remand for that purpose. If Nooter is found to be liable to the plaintiffs, the original jury verdicts on damages shall stand. Damages need not be reassessed. We intimate no position on whether, under certain circumstances, Nooter may be able to make out any claim against Ferguson for contribution or indemnity should Ferguson's employees be found not to be borrowed servants but nonetheless negligent.

Reversed and remanded for proceedings consistent herewith.