Eleanore M. RAYMOND, Administratrix
of the Estate of Alvaro J. Raymond,
Plaintiff-Appellee,

v.

I/S CARIBIA, Defendant-Appellant.

No. 79–1288.

United States Court of Appeals,
First Circuit.

Argued Feb. 6, 1980.

Decided July 24, 1980.

Thomas E. Clinton, Boston, Mass., with whom Astrid C. Glynn and Glynn & Dempsey, Boston, Mass., were on brief, for defendant-appellant.

Michael B. Latti, Boston, Mass., with whom Latti & Flannery Associates, Boston, Mass., was on brief, for plaintiff-appellee.

Before ALDRICH and BOWNES, Circuit Judges, PETTINE,* District Judge.

BOWNES, Circuit Judge.

This wrongful death action, which implicates section 5(b) of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b), was brought by plaintiff-appellee, Eleanore Raymond, as administratrix of the estate of her husband, Alvaro Raymond, against defendant-appellant, the I/S Caribia. The defendant ship has appealed a jury verdict in favor of plaintiff.

* Of the District of Rhode Island, sitting by designation.

There are two issues on appeal: whether the members of the ship's crew working in the hold were borrowed servants of the stevedore; and whether, under the facts, the ship could be found liable.

The facts are not in dispute, although the parties ascribe different inferences to them. Plaintiff's husband was a longshoreman-lumper employed by a stevedore as one of a gang of twelve men to manually discharge a cargo of cartons of frozen fish from the hold of the I/S Caribia. The fish cartons, each of which weighed 50–55 pounds and measured 15″ x 12″ x 12″, were stowed on top of each other in tiers in the hold. The procedure followed was for the individual lumper to pull a carton from the tier and place it on a cargo rack, which, when loaded, was hoisted out of the hold by a crane. When about one-half hour's work remained for clearing the hold, the lumpers found that the cartons had become frozen together so solidly that they could not be separated by hand or the use of their regular hooks. When cargo is unusually difficult to handle because it is frozen, broken apart or damaged in some other way, it is called "distressed cargo." Because longshoremen are paid by tonnage unloaded, not by the hour, if handling distressed cargo is going to take a lot more time and effort than originally anticipated, the ship and stevedore renegotiate their contract. Since there was only a short amount of time left to unload this hold, renegotiation in this case was unnecessary. The stevedore, here, had two choices: send the lumpers out on the pier to obtain crowbars and icebars, or request help from the ship's crew. The latter course was followed to save time and two members of the crew, armed with crowbars, came down into the hold to pry apart the frozen cartons. No orders or directions were given the crew members by the foreman of the lumper gang or its members. In fact, the longshoremen didn't even know whether the crew spoke English. The crew members were not paid by the stevedore or longshoremen.

After the two crewmen entered the hold, they proceeded to pry apart a number of the frozen cartons; they then stood aside and indicated to the longshoremen that the boxes were ready to be placed on the cargo rack. This process was repeated. At some point during the unloading, Raymond reached for a carton at shoulder height in a section where the crew members had presumably loosened them. As Raymond pulled the carton towards him, it became apparent that it had not been loosened and was frozen solidly to another carton. Both cartons came off the tier suddenly. Raymond tried to hold them, but was forced to the deck by their weight. Shortly thereafter, he became ill and had trouble breathing. He left the hold and, after an attack of vomiting on deck, decided to go home. As he drove his car towards the end of the pier on which the Union hall and shape-up office were located,[1] he collided with a parked truck. He was found dead in the car. Plaintiff's medical expert testified, without contradiction, that Raymond had suffered a fatal heart attack directly caused by the severe, unexpected exertion and stress imposed upon him when he tried to handle the two cartons that came off the tier instead of the one he was expecting.

■ We have no difficulty ruling as a matter of law that on these facts the crew members were not the borrowed servants of the stevedore. The prime requisite for invoking the borrowed servant doctrine is some sort of control by the borrower over the loaned employee(s). The seminal case is *The Standard Oil Co. v. Anderson,* 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480 (1909). There, plaintiff was working in the hold of a ship when he was injured by being struck by a load of oil cases that were unexpectedly lowered into the hold. All loading was done by employees of the stevedore except for the operation of the winch which lowered the cargo into the hold; this was done by an employee of defendant. In holding that the winchman was not a borrowed servant, the Supreme Court noted that he

was hired and paid by the defendant, *id.* at 219, 29 S.Ct. at 253, that defendant had the right to discharge him, *id.* at 225, 29 S.Ct. at 255, and that the signal to the winchman to commence lowering was informational, not an order, and showed cooperation, not subordination, *id.* at 226, 29 S.Ct. at 256. *See also Gaudet v. Exxon Corporation,* 562 F.2d 351, 355–57 (5th Cir. 1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1978); *Lopez v. Oldendorf,* 545 F.2d 836, 839 (2d Cir. 1976), *cert. denied,* 431 U.S. 938, 97 S.Ct. 2650, 53 L.Ed.2d 256 (1977); *Dugas v. Pelican Construction Company, Inc.,* 481 F.2d 773 (5th Cir. 1973); *Ruiz v. Shell Oil Company,* 413 F.2d 310 (5th Cir. 1969); 1B Benedict on Admiralty § 12 (7th ed. 1976).

The evidence in this case is totally lacking any of the indicia that is necessary for a finding of borrowed servants. There was no control or direction of the work of the crew members by the stevedore or longshoremen, they were not paid directly or indirectly by the stevedore and the stevedore had no employer relationship with them at all. The ship sent the crew members into the hold to loosen up the frozen cargo because it was to its advantage as well as the stevedore's and longshoremen's to get the cargo unloaded as quickly as possible. This is a classic example of cooperation, not subordination.

We also find, however, that, under these facts, there could be no legal liability on the part of the vessel. In *Anderson v. Iceland S. S. Co.,* 585 F.2d 1142 (1st Cir. 1978), we held "[t]he intent of the 1972 amendments [to the Longshoremen's and Harbor Workers' Compensation Act] was to abrogate the absolute liability of the vessel. To find liability on the part of the ship, there must be evidence that the ship breached a duty it owed to the plaintiff." *Id.* at 1151. In *Anderson,* we found the ship not liable for a slippery condition on the pier due to wet and leaking cartons of frozen fish.

■ In *Johnson v. A/S Ivarans Rederi,* 613 F.2d 334 (1st Cir. 1980), we reviewed the legislative history of the Longshore-

---

1. This pier was about one-half mile away from the pier at which the unloading was being

done. Presumably, Raymond intended to collect his pay on his way home.

men's and Harbor Workers' Act and pertinent case law and legal authority to determine the standard of care applicable in a longshoremen's action against the vessel for personal injuries. We found that the ship owes longshoremen a duty of reasonable care under the circumstances. Our analysis led to the adoption of the following standard.[2]

The standard of reasonable care under the circumstances permits a finding of negligence upon a showing:

(1) that the vessel knew of or by the exercise of reasonable care could have discovered the condition on board ship that led to the injury;

(2) that the vessel knew or should have known that the condition would pose an unreasonable risk of harm to longshoremen working on board ship; and

(3) that the vessel failed to exercise reasonable care to protect the longshoremen against that danger.

Under this standard, the principal inquiry will be whether the vessel permitted the existence of a condition that posed an unreasonable risk of harm to the longshoreman. Whether the risk of harm was in fact unreasonable may be determined by balancing the usefulness to the ship of the dangerous condition and the burden involved in curing it against the probability and severity of the harm it poses.

*Id.* at 348.

[4] Application of the standard to the facts of this case compels the conclusion that there was no basis for finding the ship liable. First, while it might be argued that the crew members knew or in the exercise of reasonable care could have determined that not all the frozen cartons had been pried apart, this is not the kind of condition that either the Act or the cases contemplated as a basis for holding a vessel liable. In the normal case, it is a condition of the ship, not the cargo, for which the vessel may be held responsible. As we noted in *Anderson*

v. *Iceland S. S. Co.,* "[t]he stevedore is hired for its expertise in handling cargo, including cargo which arrives from its journey in less than optimal condition." 585 F.2d at 1151. If one of the crew members left a crowbar among the cartons in such a position that it injured a longshoreman, there might be liability. But liability cannot be bottomed on a condition of the cargo known to the longshoremen which the crew, at the request of the stevedore, attempts to correct. Although the crew members were not borrowed servants, they were acting as longshoremen in helping to unload the hold. They were not directing the unloading. In *Johnson v. A/S Ivarans Rederi*, 613 F.2d 334, we held the vessel liable for failing to either rope off a bulkhead opening or close the hatch covers to a hold into which a longshoreman fell while trying to go up to the deck. This condition, which exists because of the failure of the vessel to exercise reasonable care, is the kind for which it may be liable.

Second, there is no evidence from which it could be found that the vessel knew or should have known that the condition would pose an unreasonable risk of harm to longshoremen. It would be stretching credulity to find that there was an unreasonable risk of harm to an experienced longshoreman in attempting to hold two cartons weighing about one hundred ten pounds, even though the extra fifty-five pounds were unanticipated. A heart attack due to sudden and unexpected physical exertion and stress, which are an integral part of a longshoreman's work, is not a harm that can reasonably be anticipated or guarded against.

Examining the evidence in the light most favorable to the plaintiff, there is no basis for finding that the vessel was negligent in any way.

*Reversed.*

ALDRICH, Senior Circuit Judge (concurring).

I agree with the second portion of the court's opinion disposing of the appeal on

---

**2.** This case was, of course, tried prior to the decision in *Johnson v. A/S Ivarans Rederi*, 613

F.2d 334 (1st Cir. 1980).

the basis of *Johnson v. A/S Ivarans Rederi,* 1 Cir., 1980, 613 F.2d 334, but, with due respect, I feel obliged to note that I find the court's treatment of the borrowed servant aspect oversimplistic.

In *Standard Oil Co. v. Anderson,* 1909, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480, the Supreme Court stated that to determine whether a given employee is a borrowed servant, "we must inquire whose is the work being performed, a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work." 212 U.S. at 221–22, 29 S.Ct. at 254. This inquiry is based on the fundamental limitation on the *respondeat superior* doctrine: "The master's responsibility cannot be extended beyond the limits of the master's work. If the servant is doing his own work or that of some other, the master is not answerable for his negligence in the performance of it." *Id.* at 221, 29 S.Ct. at 254; *see Denton v. Yazoo & Mississippi Valley R.R. Co.,* 1932, 284 U.S. 305, 308, 52 S.Ct. 141, 142, 76 L.Ed. 310; *Linstead v. Chesapeake & Ohio Ry. Co.,* 1928, 276 U.S. 28, 34, 48 S.Ct. 241, 243, 72 L.Ed. 453.

In the *Anderson* formula, strictly speaking, the question of control is useful only in ascertaining whose work is being performed.* My brethren fail to note that in *Anderson* the shipowner did not let out all the stevedore work, but, from the beginning, reserved the winching to the ship's crew, and received payment therefor, 212 U.S. at 225, 29 S.Ct. at 255. The attempt to make out a loan of employment on the basis that the winchman received directional signals naturally failed.

The present case is perhaps one of the rare instances in which the two questions, "whose work?" and "who controls?" yield different answers. It is at least clear that, contrary to *Anderson,* the crew members were performing the work of the stevedore,

not of the ship. The stevedore had contracted to unload the cargo for a flat rate per ton. Under local custom, a substantial amount of distressed cargo would result in renegotiation of the contract. When, as here, only a minimal amount of cargo was stuck, the longshoremen would break it up themselves or with the assistance of crew members. The latter course was followed here as a matter of convenience, rather then sending ashore for the necessary tools. While it was doubtless to the advantage of the ship to have the cargo unloaded quickly, its two crew members, in assisting in the unloading, unlike *Anderson,* were doing work which, under the contract, the stevedore was obligated and paid to perform. *Cf. Linstead v. Chesapeake & Ohio Ry. Co.,* ante, 276 U.S. at 34, 48 S.Ct. at 243.

The question of control is more difficult. The court makes much of the fact that the crew members were not paid by the stevedore, and that there was some advantage to the ship in having the cargo unloaded quickly. These should not be determinative. The payment of wages, the power of discharge, etc. "are not the ultimate facts, but only those more or less useful in determining whose is the work and whose is the power of control." *Standard Oil Co. v. Anderson,* ante, 212 U.S. at 225, 29 S.Ct. at 255. In the usual borrowed servant case, these reside in the general employer. *E.g., Denton v. Yazoo & Mississippi Valley R.R. Co.,* ante; *Linstead v. Chesapeake & Ohio Ry. Co.,* ante. And certainly it would be the unusual case where the loan of its servant did not confer some sort of benefit on the general employer. I would resist the thought that the borrowed servant rule operates only when the special employer assumed responsibility for the employee's salary, and the arrangement was without advantage to the general employer.

Here, in a sense, the crewmen were self-directed in loosening the cargo, leaving

* Control has sometimes been considered the *sine qua non* of the borrowed servant rule. *See, e.g., Dornan v. United States,* 9 Cir., 1972, 460 F.2d 425, 428 (applying California law); *United States v. N. A. Degerstrom, Inc.,* 9 Cir., 1969, 408 F.2d 1130, 1133. A line of Fifth Circuit cases views the two questions as merely two among nine factors to be considered, no one of which is decisive. *See Gaudet v. Exxon Corp.,* 5 Cir., 1977, 562 F.2d 351, 355–56, *cert. denied,* 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1978), and cases cited.

open the question of who would have corrected them had they been seen to be neglectful. Quite arguably it could have been the stevedore. I see no point, however, in pursuing the matter, even if control, as distinguished from whose work was being done, should be thought determinative. My sole purpose is to observe that this "extraordinarily troublesome" area, *Wilson v. Nooter Corp.*, 1 Cir., 1973, 475 F.2d 497, 500, should not be handled as easily as do my brethren.