DECISION
Before this Court is an action by Plaintiff, John Abbott (herein, "Plaintiff") alleging that injuries sustained on March 4, 2006 were caused by Defendant's negligence. Defendant Senesco Marine, LLC ("Senesco") moves for Summary Judgment pursuant to Super. R. Civ. P. 56, arguing that it is immune from liability under provisions of the Longshore and Harbor Workers' Compensation Act ("LHWCA") that exempt employers from liability for employees' workplace injuries. 33 U.S.C. §§ 901 et seq. Senesco's Motion for Summary Judgment centers on the theory that Plaintiff was acting as Senesco's "borrowed servant" at the time of the accident; and therefore, pursuant to the LHWCA, the Plaintiff cannot maintain a lawsuit against Senesco.
 I. Facts and Travel
This action arises from the Plaintiff's allegations of negligence on the part of Senesco in connection with injuries sustained during the construction of a marine vessel at Senesco's facility in North Kingstown, Rhode Island. At the heart of this matter is Plaintiff's employment status for the purposes of determining the applicability of provisions of the LHWCA to Plaintiff's *Page 2 
claims. While the Plaintiff worked as a boat builder — specifically an outside machinist — at the Senesco facility, the Plaintiff was hired and employed by a staffing entity out of Alabama, operating as Christian Construction, Inc. ("CC, Inc.").
Senesco and CC, Inc. entered an agreement that became effective on December 1, 2005, whereby Senesco contracted with CC, Inc. "for qualified Sub-Contract on various projects." ("Sub-Contract.") Pursuant to this agreement, CC, Inc. provided temporary employees to Senesco and Senesco agreed to partially reimburse CC, Inc. for the cost of the CC, Inc. employees. (Sub-Contract, Art. 4.) Article 7 of the agreement, outlining control of CC, Inc. employees, specifies that CC, Inc. is responsible for paying its employees' wages and payroll taxes, "retains the right to hire, fire, discipline, and reassign employees," and "retains the right of direction and control over the management of Workers' Compensation claims, claim filing, and related procedures."
In 2005, the Plaintiff was first hired by CC, Inc. as an outside machinist. His first assignment, refitting a ship for the Massachusetts Maritime Academy, lasted less than three months. (John Abbott Deposition, Aug. 31, 2001, at 37:6-10.) When this job concluded, the Plaintiff returned to his home in Maine to await his next assignment from CC, Inc. (Abbott Dep. at 37:18-21.) Approximately six months later, he was sent to the Senesco facility in Rhode Island to help with the construction of a tugboat. (Abbott Dep. at 37:14-23.) In February of 2006, the Plaintiff began working on the project, and in his deposition the Plaintiff testified that he expected to work on the project for about two years. (Abbott Dep. at 37:23; 39:13-16.)
In his Deposition the Plaintiff testified that he worked as part of a three member crew with other CC, Inc. workers under the supervision of William McClinton, another CC, Inc. employee. (Abbott Dep. at 58:5-12; William McClinton Deposition, Apr. 8, 2010, at 27:19-24; 28:1-20; 61:15-24; 62:1-4.) *Page 3 
The Plaintiff received his work assignments from Mr. McClinton, his supervisor at the Senesco facility. (Abbott Dep. at 48:11-18; McClinton Dep. at 62:1-4.)
On March 4, 2006, the Plaintiff was injured as he helped install the tugboat's stern tube. According to the Plaintiff, he was receiving orders from his CC, Inc. supervisor, Mr. McClinton, at the time of the injury. (Abbott Dep. at 96:11-20.) Senesco contests this assertion and maintains that all work on the project was done under Senesco's direction and control. (Aff. of Jacob A. Stevens, ¶ 12.)
Before this Court is Senesco's Motion for Summary Judgment. Senesco asks this Court to find as a matter of law that the Plaintiff was acting as Senesco's borrowed servant at the time of his accident and the LHWCA, therefore, immunizes Senesco from liability. The Plaintiff opposes the motion arguing that issues of material fact — centering on the matter of who controlled Plaintiff's work at the time of the accident — preclude summary judgment.
 II. Standard of Review
On a summary judgment motion, the court must review the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. Chavers v. Fleet Bank (RI), N.A.,844 A.2d 666, 669 (R.I. 2004). On such a motion, the court is to determine only whether a factual issue exists. It is not permitted to resolve any such factual issues. The emphasis is on issue finding, not issue determination. Estate of Giuliano v.Giuliano, 949 A.2d 386, 391 (R.I. 2008) (quoting IndustrialNat'l Bank v. Peloso,121 R.I. 305, 307, 397 A.2d 1312, 1313 (1979)). "Summary judgment is appropriate if it is apparent that no material issues of fact exist and the moving party is entitled to judgment as a matter of law."Chavers, 844 A.2d at 669. A party opposing a motion for summary judgment "`carries the burden of proving by competent *Page 4 
evidence the existence of a disputed material issue of fact and cannot rest on allegations or denials in the pleadings or on conclusions or legal opinions.'" Id. at 669-70 (quotingUnited Lending Corp. v. City of Providence,827 A.2d 626, 631 (R.I. 2003)).
 III. Analysis
The Plaintiff's employment status is critical in this case because it determines Senesco's potential liability to the Plaintiff. "Under the LHWCA an employee retains the right to sue third parties."Gaudet v. Exxon Corp., 562 F.2d 351, 357 (5th Cir. 1977). Although the LHWCA "does not explicitly adopt the borrowed servant doctrine, the word `employer' in 33 U.S.C. § 905(a) encompasses both general employers and employers who `borrow' a servant from that general employer." White v. Bethlehem Steel Corp.,222 F.3d 146, 149 (4th Cir. 2000). The primary issue before this Court therefore, is whether the Plaintiff was a borrowed servant, and by extension an employee of Senesco at the time of his accident. If he was, Senesco is immune from suit under the LHWCA.[1]
Conversely, if the Plaintiff was not Senesco's borrowed servant, the Plaintiff can pursue his claim against Senesco.
The LHWCA "is a no-fault federal compensation scheme designed to give protection to injured maritime workers while at the same time affording employers some degree of predictability with regard to those recoveries." White, 222 F.3d at 148. To receive *Page 5 
compensation under the LHWCA, an employee must satisfy both a geographical situs and an occupational status test.Chesapeake Ohio Ry. Co. v. Schwalb,493 U.S. 40, 44-47 (1989). At the time of his injury the Plaintiff was building a tugboat at the Senesco facility, and Section 903(a) of the LHWCA applies to any injury occurring "upon the navigable waters of the United States, including any . . . other adjoining area customarily used by an employer in . . . building a vessel." 33 U.S.C. § 903(a). Thus, the situs test is satisfied. Likewise, the status test is satisfied because the LHWCA applies to any employee who is "engaged in marine employment," which is defined to include shipbuilders. 33 U.S.C. § 902(3). It follows that because the situs and status tests are satisfied, this matter falls under the purview of the LHWCA. Furthermore, because determination of borrowed servant status is "best viewed as a question of the extent of coverage under the LHWCA, federal law applies." Gaudet, 562 F.2d at 357.[2]
When confronted with the issue of a crew member's borrowed servant status in Raymond v. Caribia, the First Circuit had "no difficulty ruling as a matter of law" on the issue. 626 F.2d 203, 205 (1st Cir. 1980). Similarly, the Fifth, Seventh, and Ninth Circuits have held that "the issue of whether a relationship of borrowed servant exist[s] is a matter of law."See Gaudet, 562 F.2d at 357; Ruiz v. Shell OilCo., 413 F.2d 310, 314 (5th Cir. 1969); Gudgel v. SouthernShippers, Inc., 387 F.2d 723 (7th Cir. 1967); McCollum v.Smith, 339 F.2d 348 (9th Cir. 1967). "`[I]f sufficient basic factual ingredients are undisputed, the court may grant summary judgment'" on the issue of whether an employee is a borrowed servant. Guillory, 849 F. Supp. 2d at 270 (quotingCapps v. N.L. Baroid-NL Indus., Inc.,784 F.2d 615, 617 (5th Cir. 1986)). *Page 6 
However, in some cases factual disputes must be resolved before a court can make its determination. Owen v. Chevron,8 F.3d 20, 1993 WL 455547 at *2 (5th Cir. 1993). The Fifth Circuit explained in Gaudet that the party contesting borrowed servant status "must show that genuine disputes exist over enough determinative factual ingredients to make a difference in [the] result." 562 F.2d at 358. If the non-moving party carries its burden and shows that genuine issues of material fact exist, summary judgment is not appropriate.
In the seminal case Standard Oil Company v. Anderson, the United States Supreme Court explained the borrowed servant doctrine as follows: "[o]ne may be in the general service of another, and, nevertheless, with respect to particular work, may be transferred, with his own consent or acquiescence, to the service of a third person, so that he becomes the servant of that person, with all the legal consequences of the new relation." 212 U.S. 215, 220 (1909). To determine who has the power to control and direct the workers, the Court "must carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking." Id. at 222.
Following the Standard Oil decision, Circuit Courts of Appeal developed varying tests to determine borrowed servant status under the LHWCA. Although the First Circuit has not adopted a specific test, in Raymond the court explained that the "prime requisite for invoking the borrowed servant doctrine is some sort of control by the borrower over the loaned employee(s)."626 F.2d at 205. This is similar to the Third and Fourth Circuits which both focus their inquiries into borrowed servant status on control. In the Third Circuit, when "an entity other than the one that putatively employs the claimant is really the claimant's employer, that borrowing employer [shall be] found to be the claimant's employer under the [LHWCA]" and this borrowing employer is "subject to the burdens and entitled to the benefits that come with such status." *Page 7 Peter v. Hess Oil Virgin Islands Corp.,903 F.2d 935, 941 (3rd Cir. 1990). The Fourth Circuit looks at whether the borrowing employer "has authoritative direction and control over a worker" at the time of the accident and approaches its inquiry into whose work is being performed "by ascertaining who has the power to control and direct the servants in the performance of their work." White, 222 F.3d at 149.
The Fifth Circuit uses a nine-part test to assess the borrowed servant status. This test requires the Court to consider the following factors:
 (1) Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?
 (2) Whose work is being performed?
 (3) Was there an agreement, understanding, or meeting of the minds between the original and borrowing employer?
 (4) Did the employee acquiesce in the new work situation?
 (5) Did the original employer terminate his relationship with the employee?
 (6) Who furnished the tools and place of performance?
 (7) Was the new employment over a considerable length of time?
 (8) Who had the right to discharge the employee?
 (9) Who had the obligation to pay the employee?
Gaudet, 562 F.2d at 357-58. Although no single factor is determinative, Courts emphasize the first, fourth, fifth, sixth, and seventh factors. Guillory, 534 F. Supp. 2d at 271.
Whether the Plaintiff was a borrowed servant of Senesco at the time of his injury requires this Court to analyze the extent to which the Plaintiff was under Senesco's control at the time of his injury. Although the "First Circuit has not endorsed the Fifth Circuit's nine-part test explicitly," "it is a useful rubric by which to assess the question of control in the context of borrowed servant status." Id. Accordingly, this Court will proceed with a factor-by-factor analysis of the working arrangement between the Plaintiff, CC, Inc. and Senesco. *Page 8 
1. Who had control over the Plaintiff and the work hewas performing, beyond mere suggestion of details orcooperation?
It is not entirely clear who had control over the Plaintiff and the work he was performing at the time of his accident. It is not disputed that Senesco, the general contractor, oversaw the entire tugboat construction project and employed Jake Stevens as project manager. The Plaintiff worked at the Senesco facility for only about three weeks before he was injured, and during that time he was under the direct supervision of Mr. McClinton, another CC, Inc. employee. (McClinton Dep. at 28:1-20; 61:15-24; 62:1-4.)
On the day of the injury, Mr. McClinton was supervising the installation of the tugboat's stern tube when the accident occurred. (Abbott Dep. at 96:1-20; McClinton Dep. at 41:2-5.) This stands in contrast to the facts in Guillory, where the District Court determined that although the employee "may have had some form of continued employment with [CC, Inc.'s] representative" this did not "negate the undisputed fact that the actual work performed at Senesco was directed, controlled, and overseen by Senesco, and Senesco alone." 534 F. Supp. 2d at 271.[3] Instead, it appears that management of the tugboat's construction was unclear. In the three weeks preceding the accident, the Plaintiff was receiving work assignments directly from Mr. McClinton, a CC, Inc. employee. (McClinton Dep. at 23:2-3; 28:1-20; 62:1-4.) This stands in contrast to Senesco's contention that CC, Inc. had no control over the work being performed by its employees. (Jerome Christian Deposition, Nov. 18, 2009, at 9:14-18; 148:5-17.) *Page 9 
Therefore, the issue of who had control and whose work was being performed beyond mere suggestion of details raises questions of material fact over who was controlling the Plaintiff's work at the time of the accident.
2. Whose work was being performed?
Factor two favors finding borrowed servant status. The Plaintiff was assigned to the Senesco facility by CC, Inc. to help construct the tugboat, a project for which Senesco was ultimately responsible. At the time of the accident, the Plaintiff was working on the tugboat helping to install its stern tube. Accordingly, this Court concludes that the Plaintiff was performing Senesco's work at the time of the accident.
3. Was there an agreement, understanding, or meeting ofthe minds between the original and borrowingemployer?
It is undisputed that Senesco and CC, Inc. entered into a sub-contract under which CC, Inc. provided skilled temporary workers for the tugboat construction project. Thus, this factor appears to fall slightly in Senesco's favor. However, the Court notes that the contract does evidence continued control by CC, Inc. over its employees. The contract provides that CC, Inc. was responsible for paying its employees' wages, employment taxes, and maintaining workers' compensation insurance. Additionally, CC, Inc. retained the authority to hire, discipline, reprimand, reassign, and fire its employees, including the Plaintiff. (Sub-Contract, Art. 7.) Therefore, although there is an agreement for CC, Inc. to provide Senesco skilled workers, the agreement does not give Senesco absolute control over these employees.
4. Did the employee acquiesce in the new worksituation?
The fourth factor requires the Court to examine "whether the employee was aware of his working conditions and chose to continue."Brown v. Union Oil Co. of California,984 F.2d 674, 678 (5th Cir. 1993). *Page 10 
The Plaintiff here first began working for CC, Inc. in 2005 and was assigned to work on a project in Buzzards Bay, Massachusetts. (Abbott Dep. at 25:12-21.) The Plaintiff testified that he understood himself to be an employee of CC, Inc. during the three months he spent in Buzzards Bay. (Abbott Dep. at 30:23-24.) After the Buzzards Bay project ended, the Plaintiff returned to his home in Maine until CC, Inc. assigned him to the tugboat construction project at Senesco. (Abbott Dep. at 37:18-23; 39:7-25.) The Plaintiff testified at his deposition that he was an hourly or per diem employee of CC, Inc. during his short assignment to the Senesco facility. (Abbott Dep. at 41:11-20.)
Although the Plaintiff did not object to working at the Senesco facility in Rhode Island, it is unclear whether he was aware that as part of this arrangement, he could be considered a Senesco employee. Unlike the employee in Guillory who was sent to work at Senesco two years before the accident, here the Plaintiff had less than a month to comprehend the new situation in which he was employed. 534 F. Supp. 2d at 272. Although "one month is a sufficient amount of time for [the employee] to appreciate the new work condition," it is not clear that Plaintiff fully comprehended the significance of his assignment to work on the Senesco project.Brown, 984 F.2d at 678. During his time at Senesco, the Plaintiff was always under the supervision of another CC, Inc. employee and received his paychecks from CC, Inc. (McClinton Dep. at 62:1-4; Abbott Dep. at 41:11-25; 42:1.) The Court notes that in Guillory, the District Court made specific note that the facts regarding the employee's acquiescence in the work conditions were not disputed by the employee. 534 F. Supp. 2d at 272. Here, there is a genuine dispute over the Plaintiff's understanding of his work situation, leading the Court to conclude that the factor does not weigh in favor of either party. *Page 11 
5. Did the original employer terminate his relationshipwith the employee?
The lending employer does not need to completely terminate its relationship with the employee for that employee to be the borrowed servant of another. As the Fifth Circuit explained inCapps, requiring complete termination by the lending employer would "effectively eliminate the borrowed employee doctrine as there could never be two employers." 784 F.2d at 618. Instead, Courts focus on the lending employer's relationship during the period in which the alleged borrowing transpires. Id. InGuillory, the District Court noted that the employee "shed no light on the work relationship at issue" and "fail[ed] to address issues such as whether [CC, Inc.] exercised control over the work performed by [the employee], or whether [CC, Inc.] placed any restrictions on Senesco with respect to working conditions."534 F. Supp. 2d at 272. Accordingly, the Court found that because CC, Inc. "exercised no control over [the employee], placed no restrictions on the working conditions at the Senesco facility, and had nominal on-site contact with and influence over [the employee]," this factor weighed in favor of borrowed servant status.Id.
Here, the parties contest the extent to which CC, Inc. maintained contact with the Plaintiff while he was working at the Senesco facility. The Plaintiff points out that in addition to retaining the authority to hire, re-assign, discipline, and terminate the Plaintiff, [4] CC, Inc. paid the Plaintiff for his work and provided a stipend for housing. (Sub-Contract, Art 7.) Most significantly, in the weeks preceding the accident and at the time of the accident, the Plaintiff was under the direct supervision of another CC, Inc. employee. (McClinton Dep. at 22:22-24; 23:1-8; 27:19-24; 28:1-20; 61:15-24; 62:1-4.) However, Senesco contends that CC, Inc. had at most nominal control over the Plaintiff and no input into the work that the Plaintiff performed on *Page 12 
a daily basis. Senesco maintains that Project Manager Jake Stevens oversaw and dictated the work that outside machinists would be performing each day. (Aff. of Jacob A. Stevens, ¶¶ 10, 12.) Given this factual dispute between the parties, this factor cannot be attributed to either party.
6. Who furnished tools and place forperformance?
It is undisputed that the place of performance was the Senesco facility in Rhode Island. Who furnished the tools is a point of minor contention. Senesco maintains that with the exception of nominal small hand tools, all tools, equipment, and materials were provided by Senesco. CC, Inc. employees supplied their own hand tools incidental to their particular trade. (McClinton Dep. at 62:5-15.) However, in his deposition, Mr. McClinton went on to explain that electric tools and power tools were provided by Senesco. (McClinton Dep. at 62:18-24; 63:1-2.) The Plaintiff maintains that when a CC, Inc. employee needed a tool that was not available, he would approach Mr. McClinton who would order the tool for the employee, indicating that from Plaintiff's perspective, tools were supplied by another CC, Inc. employee. (McClinton Dep. at 151:3-21.) However, larger tools such as cranes and forklifts were owned and supplied by Senesco, and the Plaintiff was injured when the stern tube rolled off of Senesco's forklift. The Court concludes that this factor favors Senesco, because an employee's misperception that tools were ordered and supplied by CC, Inc. does not negate the fact that Senesco furnished both the tools and place for performance.
7. Was the new employment over a considerable length oftime?
The arrangement between the Plaintiff, CC, Inc., and Senesco existed for less than one month before the Plaintiff's accident. Although the Plaintiff admits that he expected to work on the project for about two years, this new employment situation was relatively brief. In both *Page 13 Capps, where an employee was injured on the first day of his assignment and Billizon v. Conoco, Inc., where an employee was injured after working longer than three months, the Fifth Circuit held that this factor was neutral. 784 F.2d at 618;993 F.2d 104, 106 (5th Cir. 1993). Similarly, because the Plaintiff worked for less than one month at the Senesco facility, this Court finds that the seventh factor is neutral.
8. Who had the right to discharge theemployee?
Pursuant to the Sub-Contract, CC, Inc. has the right to "hire, fire, discipline, and reassign employees." (Sub-Contract, Art. 7.) However, the President of CC, Inc. testified in his deposition that it retained the right to terminate and discipline employees only for acts that did not occur on the Senesco worksite. (Jerome Christian Depo. at 47:14-15.) He also stated that for acts that occurred on the Senesco facility, CC, Inc. would terminate or discipline its employees at Senesco's request. (Christian Depo. at 48:1-9.)
Although it appears from Mr. Christian's deposition testimony that Senesco could request that a CC, Inc. employee be disciplined or discharged, CC, Inc. had the ultimate authority to carry out this action. Moreover, where CC, Inc. wanted to discharge an employee for acts that did not occur at the Senesco facility, there is no evidence that Senesco had the authority to challenge this decision and retain the employee. Therefore, the Court finds that the eighth factor tilts in favor of the Plaintiff.
9. Who had the obligation to pay theemployee?
The Plaintiff was paid by CC, Inc. based on the hours he worked at the Senesco facility each week. The Sub-Contract establishes that CC, Inc. has the obligation to pay its employees "without regard to payments by [Senesco] to CC, Inc." (Sub-Contract, Art. 7.) Therefore, although CC, Inc. may have received money from Senesco with which to pay the Plaintiff, the *Page 14 
obligation to pay the Plaintiff remained with CC, Inc. Therefore, the final factor weighs against finding borrowed servant status.
After carefully weighing the deposition testimony and affidavits presented to the Court, and using the nine factors from the Fifth Circuit as a rubric for analyzing Senesco's control over the Plaintiff, the Court concludes that issues of material fact preclude summary judgment. Although factors two, three, and six favor finding borrowed servant status, factors eight and nine weigh against this finding. The seventh factor is neutral. The first, fourth, and fifth factors, some of the most significant factors in the borrowed servant determination, present contested issues of fact.See Guillory, 534 F. Supp. 2d at 271 (noting that Courts emphasize the first, fourth, fifth, sixth, and seventh factors). Furthermore, the contested factual issues center on who controlled the Plaintiff at the time of the accident, and in the First Circuit, borrowed servant status turns on the control that the borrower exerts over the loaned employee. See Raymond,626 F.2d at 205. Drawing inferences in the light most favorable to the Plaintiff, these contested issues of material fact prevent the Court from determining Plaintiff's borrowed servant status as a matter of law.
 IV. Conclusion
Senesco's Motion for Summary Judgment is denied.
[1] The LHWCA provides that:
 [i]f on account of a disability or death for which compensation is payable under this chapter the person entitled to such compensation determines that some person other than the employer or a person or persons in his employ is liable in damages, he need not elect whether to receive such compensation or to recover damages against such third person. 33 U.S.C. § 933(a).
It follows that under the comprehensive scheme of the LHWCA, an employer cannot be held liable for damages.
[2] In Guillory v. Gukutu, the District Court of Rhode Island did not apply the Rhode Island Supreme Court'sMainella v. Staff Builders Industrial Services, Inc. decision applying Rhode Island's borrowed servant doctrine, explaining that "because the instant case involves the LHWCA, and its own particular comprehensive scheme, Mainella is inapplicable. 534 F. Supp. 2d 267, 275 n. 3 (D.R.I. 2008).
[3] It should be noted that Guillory also dealt with an injury that occurred at the Senesco facility. The Court was tasked with determining whether the decedent's co-worker — who like Mr. Abbott was hired by CC, Inc. — was a borrowed servant of Senesco and immune from liability for the death of his co-worker.Guillory, 534 F. Supp. 2d at 271. The District Court specifically noted that all facts presented were undisputed because instead of filing a statement of disputed facts in response to Defendant's Statement of Uncontested Facts, the Plaintiff inGuillory filed only a Statement of Additional Undisputed Facts. Id. at 271 n. 2.
[4] A question exists over whether CC, Inc. retained the authority to discipline employees only for misconduct that occurred outside the Senesco facility. *Page 1